[Civil No. 3863.   Filed May 24, 1937.]

[68 Pac. (2d) 329.]

EDWIN T. STEWART, Individually and as Water Commissioner of the State of Arizona, Appellant, v. VERDE RIVER IRRIGATION AND POWER DISTRICT, a Corporation, Appellee.

Mr. Joe Conway, Attorney General, Mr. E. G. Frazier, Special Assistant Attorney General, and Mr. Elmer C. Coker, of Counsel, for Appellant.

Messrs. Hayes & Allee, for Appellee.

LOCKWOOD, J.—This is an appeal from a judgment of the superior court of Maricopa county, in favor of Verde Irrigation & Power District, a corporation, hereinafter called plaintiff, against Edwin T. Stewart, individually, and as State Water Commissioner. The suit was originally against Frank P. Trott, the then water commissioner, Edwin T. Stewart, his successor, being later substituted as defendant, but as the case involves only the official acts of the water commissioner, we shall use the term "defendant" as applied to both Stewart and Trott indiscriminately. The facts of the case are nowise in dispute, the question before us being one of law only, and may be stated as follows: Plaintiff is an irrigation district duly organized under the laws of the state of Arizona, having within its boundary some 96,000 acres of land, and defendant is the duly appointed and acting water commissioner of the state of Arizona. At some time before the 9th of February, 1934, plaintiff filed in the office of the defendant an application to appropriate sufficient waters from the Verde River for the irrigation of the lands aforesaid, and for the development of approximately 25,000 theoretical horsepower of electrical energy. At the time of the filing of the application it paid to defendant the fee of $3 prescribed by law. Thereafter the latter duly examined the application and found it, as finally corrected, completed, and re-

filed in his office, to be sufficient in form in all respects, and notified plaintiff that he was ready to approve the application and cause to be filed in his office, in the manner prescribed by law, the permit applied for, but demanded as a condition precedent thereto that the plaintiff should pay to him, as such water commissioner, the sum of $10,970.40, for the reason that section 3316, Revised Code 1928, required the payment of such fee before the filing and recording of the permit as aforesaid. Plaintiff claimed that such section was unconstitutional for various reasons, and tendered to defendant the sum of $50 for filing and recording the permit, but defendant refused to file and record it until the payment of the full amount demanded. Plaintiff, being desirous of beginning the construction of dams and other works for storing and diverting the waters sought to be appropriated, and being in such a position it could not proceed with the development of its project without a permit as required by law, then paid to the defendant, under protest, the sum demanded by him, and the latter thereupon caused the permit to be filed and recorded. Immediately thereafter plaintiff filed this suit in the superior court of Maricopa county, asking that defendant be enjoined from paying the amount set forth over to the state treasurer of Arizona, and that upon final trial of the case plaintiff recover the amount so paid under protest.

The temporary restraining order was immediately granted, and thereafter defendant appeared and demurred to the complaint on three grounds, (a) that the court had no jurisdiction of the subject matter of the action, (b) that the plaintiff was seeking to prevent the execution of a public statute by an officer of the state for the public benefit, and (c) that the complaint failed to state facts sufficient to constitute a cause of action. The demurrer was presented to the court, which, after considering the matter, rendered judg-

ment in favor of the plaintiff, whereupon this appeal was taken.

It is the contention of plaintiff that the demand made by defendant upon it for the payment of the fee above set forth was unlawful for the reason that section 3316, *supra,* by virtue of which the demand was made, is unconstitutional. In support of its contention, it raises four points, (1) that the amount so demanded is a tax and that the section, therefore, violates the provisions of section 1, article 9, of the Constitution of Arizona which require, "All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax"; (2) that it violates the provisions of section 9 of said article, which requires that, "Every law which imposes, continues, or revives a tax shall distinctly state the tax and the objects for which it shall be applied"; (3) that it violates the Fourteenth Amendment to the Constitution of the United States, in that it seeks to deprive the plaintiff of its property without due process of law, and to deny to plaintiff the equal protection of the law; and (4) that, if the charges required by the statute are not taxes, but are fees, they are so grossly out of proportion to the reasonable value of the service rendered by the water commissioner that they amount to an arbitrary imposition and tax placed upon plaintiff.

It is the contention of the defendant, on the other hand, (1) that the court had no jurisdiction of the action, for the reason that if it amounts to an attempt to collect a tax injunctive relief is prohibited by section 3136, Revised Code 1928, and section 55, chapter 103, Laws of Arizona 1931, (2) that it is an attempt to enjoin an officer of the law from executing a public statute for the public benefit, which is prohibited by section 4281, Revised Code 1928, (3) that the amount

demanded of plaintiff was not a tax, but a fee for services to be rendered, and (4) that the amount thereof was not so unreasonable as to be unconstitutional. The two procedural questions raised by defendant are of considerable interest, but we think the case can and should be decided upon its merits, which turns upon the meaning and constitutionality of section 3316, *supra*. In order to do this properly it is necessary that we review briefly the history of water legislation in Arizona.

At the time of the acquisition of what is now the state of Arizona from the republic of Mexico, the government of the United States and its agent, the government of the territory of Arizona, had the right to dispose of and regulate the use of the water therein of every nature, both surface and subterranean, in its dual capacity as sovereign and as proprietor of the public domain, subject only to such rights to the use of specific waters as had previously been acquired, and to the right of use of percolating waters underlying lands then in private hands. *Maricopa County Municipal Water Conservation Dist. No. 1 v. Southwest Cotton Co.*, 39 Ariz. 65, 4 Pac. (2d) 369. Realizing the importance of establishing a definite system governing the use of the public waters of the state, which should be appropriate to our local conditions, the first legislature of the territory, at the suggestion of Governor Goodwin, adopted article 22 of the Bill of Rights (Comp. Laws 1864–1871, p. 25), which reads as follows:

"All streams, lakes and ponds of water capable of being used for the purposes of navigation or irrigation, are hereby declared to be public property; and no individual or corporation shall have the right to appropriate them exclusively to their own private use, except under such equitable regulations and restrictions as the Legislature shall provide for that purpose."

And in chapter 55 of the Howell Code of 1864, the following language appears:

"Section 1. All rivers, creeks and streams of running water in the Territory of Arizona are hereby declared public, and applicable to the purposes of irrigation and mining, as hereinafter provided.

"Sec. 2. All rights in *acequias,* or irrigating canals, heretofore established shall not be disturbed, nor shall the course of such *acequias* be changed without the consent of the proprietors of such established rights.

"Sec. 3. All the inhabitants of this Territory who own or possess arable and irrigable lands, shall have the right to construct public or private *acequias,* and obtain the necessary water for the same from any convenient river, creek or stream of running water."

The legislature followed this declaration of the fundamental principles of water law by a number of provisions regulating the use of public and private *acequias*—the name then given to irrigation canals—but did not establish any particular method regulating the *acquirement* of water rights or the *adjudication of priorities* between such rights. This legislation was carried over into the Code of 1877 and Civil Code 1887 (pars. 3199–3201), substantially unchanged. It was, therefore, necessary that the courts determine how these two questions could be settled, and we have consistently held that appropriations of the use of the public waters of the state and the rights acquired thereby were regulated by three principles, (a) appropriations were made by the actual application of water to a beneficial use, (b) the prior appropriator in point of time was prior in point of right, and (c) the time the right of appropriation accrued was the day of the actual beneficial application of the waters to the purpose for which they had been appropriated. No formalities of any nature, either in initiating or completing the appropriation, were then required by

statute, and none were fixed by the courts. Conflicting claims to the prior right to use water were settled by an ordinary equitable suit in the district court. *Clough* v. *Wing*, 2 Ariz. 371, 17 Pac. 453; *Slosser* v. *Salt River Canal Co.*, 7 Ariz. 376, 65 Pac. 332. In 1893 the first change of moment in the law of appropriation was made by Act No. 86 of the Session Laws of that year, to the effect that any person desiring to appropriate water should first post at the point of diversion of the water a notice showing the amount of water appropriated, together with a general statement of the character of irrigation work to be constructed, and a provision that those works must be completed within a reasonable time. The courts, carrying out the evident legislative intent, then held that, if the works were completed within such reasonable time, the date of the right to the use of the water related back to the original posting of the notice. *Maricopa County Municipal etc. Dist.* v. *Southwest Cotton Co., supra.* The Civil Code of 1901 (pars. 4169, 4170) continued this situation, with no fundamental changes until statehood. The Civil Code of 1913 (pars. 5337, 5338) was substantially a re-enactment of the existing statutory water law, but it also provided a somewhat elaborate system for the establishment of irrigation and drainage districts. These provisions, however, did not in any material manner change the existing law governing the right and method of appropriating water and determining the relative rights of the claimants to the use of such water.

Summarizing the situation as it existed on January 1, 1919, the rights to the use of the unappropriated public waters of the state might be acquired by any person upon the application of such waters to one of the beneficial uses permitted by law, the only formality connected therewith being the posting of a notice at the point of diversion of the water, showing the amount

of water appropriated and the character of the irrigation works to be built, and there was no special statutory provision whereby water rights acquired should be determined or protected, the question being settled by the courts through civil litigation of the character used for the protection of any other property rights.

■ This history substantially parallels the history of all of the western states which follow the doctrine of prior appropriation, rather than that of riparian rights. Wyoming was the first state where the legislature realized that such a system, satisfactory enough when there was ample water for the use of everyone, would not work so well as appropriations increased until, in many cases, the nominal appropriations from a source of water greatly exceeded the actual amount of water available. It, therefore, was the first of the western states to adopt a Water Code which, in substance, required an investigation by public authority as to whether considerations of public policy justified the authorization of the new appropriation and, as a corollary thereto, provided a system for determining respective water rights which differed in many details from that of the ordinary civil action. Wyoming was quickly followed by many of the other states, among them being Oregon, and when our legislature decided it was necessary to adopt some kind of a water code, it must have determined that the Oregon statute was the one best suited to our conditions, for our Water Code of 1919 (Laws 1919, chap. 164), except for the fact that the general control of public waters is placed in a water commissioner rather than in a board of control composed of the state engineer and the superintendents of the four water divisions into which that state is divided and that it is arranged a little differently, follows the Oregon law almost *verbatim* so far as it goes. That this is true may readily be determined by a comparison of our Water Code of 1919,

section by section, with that of Oregon. The decisions of the Oregon courts upon questions arising under their Code are, therefore, very persuasive to us.

A careful analysis of the Water Code of 1919 reveals a very definite and systematic plan for handling the public waters of the state. This includes all waters heretofore or hereafter to be appropriated, for it must be remembered that, since the beginning of our history as a state, all its appropriable waters have been held to be the property of the state and not subject to ownership by any person, all that is acquired by the so called appropriation thereof being merely a right to *use* these waters, *subject to the regulations imposed by the state.* The Code consists of 62 sections and falls naturally into four parts. The first four sections lay down the fundamental principles of the law of appropriation, and create the office of water commissioner and declare the duties of the commissioner. Sections 5 to 15, inclusive, set up a method for new appropriations of water. Sections 16 to 33, inclusive, provide a method for determining the respective priorities of water rights which, it is claimed, have already vested. Sections 34 to 62, inclusive, contain general provisions in regard to the use of water which do not naturally fall under the three divisions we have just mentioned. Sections 21 and 51 of the Code provide for the payment of certain fees to the water commissioner. They read as follows:

"Section 21. At the time of the submission of proof of appropriation, or at the time of the taking of testimony for the determination of rights to water, the Commissioner shall collect from each of the claimants or owners a fee of two dollars ($2.00) for the purpose of recording the water right certificate, when issued, in the office of the county recorder together with the additional fee of twelve cents for each acre of irrigated lands up to and including one hundred acres, and ten cents per acre for each acre in excess of one hundred

acres; also twenty-five cents for each theoretical horsepower up to and including one hundred horsepower, and fifteen cents for each horsepower in excess of one hundred up to and including one thousand horsepower, and five cents for each horsepower in excess of one thousand horsepower up to and including two thousand horsepower, and two cents for each horsepower in excess of two thousand horsepower as set forth in such proof, the minimum fee, however, for any claimant or owner in such cases to be $2.50; also a fee of $5.00 for any other character of claim to water. All fees collected by the Commissioner shall be paid into the State Treasury to become a part of a fund to be known as the State Water Fund; which fund shall be kept separately from all other state funds by the State Treasurer and used by him to the extent of its resources and in preference to the use of any other appropriation of the State funds, for the payment of the duly authorized expenses of the Commissioner.''

"Section 51. The following fees shall be collected by the Commissioner in advance and be paid by him into the State Water Fund of the State Treasury on the last day of each month.

"1. For examining an application for permit to appropriate water, $3.00.

"2. For filing and recording permit to appropriate water for irrigation purposes, twelve cents per acre for each acre to be irrigated up to and including one hundred acres, and ten cents per acre for each acre in excess of one hundred acres, or in case the application is for power purposes, twenty-five cents for each theoretical horsepower to be developed up to and including one hundred, and ten cents for each horsepower in excess of one hundred and up to and including one thousand, and five cents for each horsepower in excess of one thousand; or in case the application is for any other purpose, $5.00 for filing and recording each permit.

"3. For filing or recording any other water right instrument, $1.00 for the first hundred words and ten cents for each additional hundred words or fraction thereof.

"4. For making copy of any document recorded or filed in his office, ten cents for each hundred words or fraction thereof; but where the amount exceeds $5.00, then only the actual cost in excess of that amount shall be charged.

"5. For certifying copies, documents, records, or maps, $1.00 for each certificate.

"6. For blue print copy of any map or drawing, ten cents per square foot or fraction thereof. For such other work as may be required of his office, actual cost of the work."

In 1922 the Financial Code was adopted (chapter 35, Special Session Fifth Legislature) which abolished the separate water fund established by the last sentence of section 21, *supra,* and provided the receipts of the office of the water commissioner should be paid into the general fund and the expenses paid therefrom in the usual manner, to the extent of the regular appropriation for such office. In the Revised Code of 1928, sections 21 and 51, *supra,* were united as section 3316 of that Code, with a very few minor verbal changes, in no way affecting the meaning of the two separate sections. The substance of the law, so far as these sections are concerned, therefore, remained unchanged from that of the Code of 1919, except as to the payment of fees into the general fund. *In re Estate of Sullivan,* 38 Ariz. 387, 300 Pac. 193. We shall, therefore, refer to the original sections as being the current law of the case, except as to that one point.

It is the contention of the plaintiff that these two sections, in effect, require the payment of two fees for the appropriation of water, one when the application for the permit to commence work is made, and the other when the work is completed. We think it is mistaken in its view. It will be seen that section 21 falls within that particular subdivision which, as we have said, sets up a systematic plan for determining the rights of contesting claimants to already vested water

rights, for it fixes the time at which the fee shall be paid as "At the time of the submission of proof of appropriation, or at the time of the taking of testimony for the determination of rights to water," while section 51 refers to the "filing and recording permit to appropriate water for irrigation purposes." We are of the opinion that the two sections refer to two entirely different matters, section 51 applying to cases where an application is made for a permit to appropriate waters, while section 21 refers to contests over water already appropriated. This is borne out by the fact that the amount of the fee demanded by the two sections varies in some particulars. A precisely similar question arose in the case of *Pacific Livestock Co.* v. *Cochran,* 73 Or. 417, 144 Pac. 668, 672. Construing the sections of the Oregon Code, from which sections 21 and 51 were taken, the court says:

"The theory of the act seems to have in contemplation the fact that ultimately all claims to water rights in the streams of this state will have to be determined and settled by the board, and exacts in advance from the applicant for a permit the possible expense of a determination of his rights. Having paid this once, he in good conscience should not be required to pay it a second time. If any one should be heard to complain of discrimination, it would seem that the applicant for a permit is that person in so much as he may possibly be required to lay out of the use of the money contributed for a long period before his rights are finally determined. However, as the taking out of a permit is purely a voluntary act which he may or may not leave undone, he cannot be heard to complain. We are of the opinion that the construction of section 6641 is as above indicated, although the language used is somewhat involved. The whole section is as follows: [quoting section in full].

"Bearing in mind that the applicant for a permit is required by section 6601 to pay in advance acreage fees, that is, graduated fees proportionate to the num-

ber of acres to be irrigated and a fee for recording his permit, and that he is required by section 6633 to make final proof to the satisfaction of the board of control that his proposed appropriation has been perfected, it would seem that by the section above quoted it was intended to indicate that at the final determination no further fee should be collected from the appropriator under the act of 1909, beyond the sum of $1 necessary to record his certificate of final determination; that being the only fee not before exacted of him under the provisions of the previous section. But it was, no doubt, the intent of the lawmakers to require of other persons taking the benefit of the law by having their claims adjudicated under it to pay a like sum as, at least, partial compensation for the expense to the state. In this we see no discrimination or unfairness, and certainly nothing that would satisfy us beyond a reasonable doubt that the act is unconstitutional.''

We agree with the rule laid down by the Supreme Court of Oregon, and hold that the act does not exact two fees for the steps necessary to acquire a valid appropriation, but provides one schedule of fees to be paid once only for the acquirement of such right, and another schedule of fees to be paid once only for the establishment as between rival claimants of water rights already vested.

■■ The next question which naturally arises is whether the sums required to be paid by appropriators and claimants are, in reality, fees as claimed by defendant, or taxes as contended by plaintiff. The word ''fee'' is defined to be, ''a charge fixed by law for the service of a public officer,'' while a ''tax'' is ''a forced contribution of wealth to meet the public needs of the government.'' Webster's New International Dictionary. The distinction between the two is very plain. A tax is imposed upon the party paying it by mandate of the public authorities, without his being consulted in regard to its necessity, or having any option as to

its payment. The amount is not determined by any reference to the service which he receives from the government, but by his ability to pay, based on property or income. On the other hand, a fee is always voluntary, in the sense that the party who pays it originally has, of his own volition, asked a public officer to perform certain services for him, which presumably bestow upon him a benefit not shared by other members of society. We think it is clear that the payment which plaintiff is seeking to recover is in no sense a tax, but is rather a fee. In the first place, the necessity of its payment does not arise unless and until the individual request the public authority to perform some particular service. So long as the service is not asked, the money will never be demanded. In the second place, the service which is requested of the defendant is one which obviously and admittedly will confer a particular benefit on plaintiff alone, and upon no other person, natural nor artificial. We hold, therefore, that the amount in controversy was collected from plaintiff as a fee and not as a tax, and as such is not subject to the constitutional inhibitions imposed upon taxes, but rather to such as may exist as against fees.

We come then to the one question in the case which seems to be somewhat difficult of determination, and that is, whether the fee fixed by the statute is beyond the boundaries of that permissible to legislative action. In so determining, there are two factors which must be considered, (a) was the fee based upon the theory of paying the reasonable expenses to the state of furnishing the service, or was it fixed for the purpose of returning a surplus revenue to the state, and (b) if the former be true, was the scale of payment in reasonable proportion to the services rendered. To illustrate, if the expense to the state of conducting a certain department, which is maintained for the purpose of rendering services to individuals who

profit directly thereby, is $50,000 a year, and the fees charged are so fixed by the legislature that it may reasonably be anticipated that the annual returns will approximate the cost of the department, and no more, obviously the purpose of the legislature was not to make a profit, but to pay expenses. If, on the other hand, the probable costs of maintenance were $50,000, but the fees were such that it might reasonably be anticipated the returns would be $500,000, it is equally plain that it must be assumed the real purpose of the legislature was revenue for the general expenses of the state, and not merely the maintenance of the department which furnishes the service.

Let us examine the cost of the office of the water commissioner since its establishment, so far as is possible, in order to answer question (a). The annual appropriation for the office of the water commission from 1919 to 1936 has varied from a maximum of $23,600 in 1921–1922, to a minimum of $5,565 in 1933–1934. This last sum we think may be discarded from consideration, because the very small appropriation was due to certain political reasons which we need not discuss now. Leaving that biennium out of the picture, the average appropriation has been about $15,000 per year. If the fees to be collected were to cover the expenses of running the department, it is plain that it would have to dispose of cases involving almost 150,000 acres of land per year, either through new appropriations or adjudication of old vested rights. In the course of eighteen years, this would mean between two and one-half and three million acres of land would have passed through the office of the water commissioner, if we are to disregard power applications, and only slightly less if the latter are to be included. It is a well-known fact, of which we think this court may well take judicial notice, that this is far more than the entire area of irrigated land in Arizona.

Every presumption is, of course, in favor of the validity of an act of the legislature, and we think it would be a most violent assumption, indeed, with these facts before us, to say, as a matter of law, that the total amount of fees which could reasonably have been anticipated would be received through the water department would exceed, or even equal, the cost of maintaining such department. Further, the original act clearly contemplated this for section 21, *supra,* provided that the fees collected should be used *"to the extent of its resources* and in preference to the use of any other appropriation" to pay the expenses of the office, and a special appropriation of $15,000 was also made, a very definite intimation the legislature did not expect the fees to make the office fully self supporting. Our answer to question (a), therefore, is that the presumption is the legislature fixed the fee schedule in the Water Code on the theory, and with the reasonable expectation, of obtaining a revenue not greater than the cost of maintaining the department, and not for the purpose of securing revenue for the general expenses of the state government. Plaintiff has suggested, it is true, that the entire receipts of the department are now turned in to the state treasurer, and not set aside specifically for the use of the department. This fact, of course, may be considered, but it is by no means conclusive on the question. In view of the policy of our state, established in the Financial Code of 1922, that the receipts of all of its departments are turned in to the treasurer, and the expenses paid by direct appropriation, and of the other matters above referred to, we think it is not sufficient to overcome the usual presumption of the validity of the acts of the legislature. The real test is not the manner in which the fees are handled, but the ultimate purpose of the legislature, cost or surplus revenue.

But even though it be true that the total amount of revenue received by the department can reasonably be anticipated to be no more than sufficient for the cost of maintenance, we must consider whether the fees are properly apportioned, for if they are collected on a classified basis, as in section 3316, *supra,* the classification must be such that the fees paid by each particular applicant bear some reasonable relation to the service to be performed by the department in his behalf. Questions of this nature have frequently been before the courts, and the general principle just stated has been steadily maintained. One of the commonest forms in which the question has arisen has been where the fees for the probating of estates or the making of reports of various kinds have been based upon the value of the property of the estate, or upon which the report was made. In such cases it has been held with practical uniformity that, since the labor and services performed in probating small estates, or reporting on small businesses, are almost identical with those of large ones, it is not permissible for the legislature to establish a schedule of fees based on the value of the property. *Berryman* v. *Bowers,* 31 Ariz. 56, 250 Pac. 361; *Pittsburgh, C. & St. L. R. Co.* v. *State,* 49 Ohio St. 189, 30 N. E. 435, 16 L. R. A. 380. If, therefore, as contended by plaintiff, the services to be performed by the water commissioner precedent to the issuing of a permit for a hundred thousand acres, as in the present case, were of such a nature that there is practically no greater labor therein than when the application is for sufficient to irrigate a hundred acres, it would violate the rule just stated.

In order to determine this question, it is necessary for us to examine the statute and determine just what the rights and duties of the water commissioner, in regard to the issuing of the permit in question, consist of. Sections 6, 7, 8, and 13, of the Code of 1919 (Laws

1919, chap. 164), set forth these duties and rights so far as the initiation and completion of a valid appropriation are concerned. We think the most vital provision thereof is that contained in the following language:

"Section 7. . . . it shall be the duty of the Commissioner to approve all applications made in proper form which contemplate the application of water to a beneficial use, when the provisions of this act are complied with; *but when the proposed use conflicts with vested rights, or is a menace to the safety or against the interest and welfare of the public, the application shall be rejected.*" (Italics ours.)

It was the contention of the plaintiff that the work to be performed by the commissioner in regard to an application was ministerial and perfunctory only in its nature, and confined to an examination of the application to determine whether the forms required by the law had been followed. Such a construction of the Water Code would emasculate its provisions in regard to the appropriation of waters and render them, indeed, almost valueless. If this were the only purpose it would be absurd to require a fee of $10,000 for the mere examination of an application consisting, perhaps at the most, of a dozen or fifteen typewritten pages, to see whether its formal makeup complied with the law. We cannot conceive, however, in view of the history of our water law and the establishment of the Water Code, and particularly of the language just quoted, that this was the purpose of the legislature. On the contrary, as stated by the Supreme Court of Oregon, in *Pacific Livestock Company* v. *Cochran, supra* (which language was referred to approvingly by the Supreme Court of the United States in *Pacific Live Stock Co.* v. *Lewis,* 241 U. S. 440, 36 Sup. Ct. 637, 60 L. Ed. 1084):

"It is not necessary here to decide whether the proceeding by the board to determine water rights is judicial or administrative. To a large extent it is administrative, but, like many proceedings of that character, the board must also act in a *quasi*-judicial capacity. A determination of the water rights to a stream finally ends as a report to the circuit court, and a decree of final determination by that court. The board is required to take testimony which consumes the time of a stenographer paid by the state; to make, through the state engineer, an examination of the stream and the works diverting water therefrom, including the measurement of the discharge of the stream and of the capacity of the various ditches and canals; to examine and measure the irrigated lands and to gather such other data as may be necessary; to reduce the same to writing and make it a matter of record in the office of the state engineer; to make maps and plats of the various ditches and of the stream— all at the expense of the state. That these services are beneficial to the claimant and necessary to the preservation of his rights in the stream and the protection and assurance of his title goes without saying. The people in general, for instance taxpayers in the western part of the state, have little or no interest in the determination of the question as to whether the title of the Pacific Live Stock Company to a particular quantity of water is settled one way or the other. The proceeding is primarily beneficial only to the parties in interest, and in justice they should bear their share of the cost. Nor does the fact they are not the moving parties alter the situation. It has always been the custom for courts to demand of litigants, whether plaintiff or defendant, fees to partly defray the expense of litigation—clerk's fees, trial fees, and others of like nature—and to forbid the filing of papers or the trial of a cause until such fees are paid. The only limit to this power is that the fee shall not be disproportionate to the service rendered. In the case at bar it is contended that the rule established by the statute is arbitrary and not so proportioned. It is, of course, difficult to fix a rule that will apply with mathematical nicety to every case, but in the present

instance it is reasonable to assume that the expense to the state of the investigation, mapping, taking testimony, and other acts involved in the determination of the claimant's rights will equal and in many cases exceed the amount of the fee charged; and that the method indicated by the act by which the amount is determined is eminently fair.''

It is true that the Supreme Court of Oregon was referring specifically to procedure under that portion of its act which refers to the adjustment of conflicting claims or rights already vested, but we think it obvious that the duty imposed upon the water commissioner of determining in advance of the issuance of the permit whether the application and the proposed use conflicts with vested rights, or is a menace to the safety or against the interest and welfare of the people may, in many cases, require as extensive and expensive an investigation and hearing as a proceeding under the other portion of the statute. It may be, of course, in some cases that little more will be required than a very perfunctory investigation. But in others long and expensive surveys of the land and investigation of the proposed works, involving expert engineering skill and even a hearing of considerable extent, might be necessary before the commissioner could determine whether the proposed application conflicts with other rights already vested, or is against the interest and welfare of the public. Applying this rule to the present case, it is a notorious fact that the Salt River Valley Water Users' Association which comprises some 250,000 acres of the most valuable irrigated land in the state, has at all times violently opposed the granting of any right of appropriation of the waters of the Verde River to the plaintiff, on the ground that any rights granted thereby would conflict most seriously with the vested interests of the association in such water. Whether or not, as a matter of fact, the

association could have maintained its contention successfully in the courts, we express no opinion. But the conflict was imminent and apparent, and certainly a conscientious and careful water commissioner, before granting a permit which was bound to result in litigation of the most extensive and expensive type eventually, would have considered most carefully all of the questions involved, legal, physical, and financial, and such consideration to be of any real value must have required much labor, both on the part of the commissioner and such others as he might necessarily be compelled to employ to assist him. We are of the opinion it is apparent the services required in determining whether an appropriation for a hundred thousand acres should be granted always may, frequently must, greatly exceed in value the services required in determining the same question in regard to an appropriation for a hundred acres. And such being the case, we may not, as a matter of law, hold that the legislature made an arbitrary or unreasonable classification in fixing the fees set forth in section 3316, *supra,* which should be paid by an applicant for a permit to appropriate waters. The defendant, therefore, properly demanded from the plaintiff the payment of the fees fixed by that section, as a condition precedent to the issuing of the permit in question. It may be that defendant did not, as a matter of fact, make the investigation which he should have made before issuing the permit, but this does not affect the legality of the statute. The fee is based upon what the water commissioner *should,* and not what he actually *does do* or *fails to do,* in the particular case.

The judgment of the superior court of Maricopa county is reversed, and the case remanded, with instructions to enter judgment for defendant.

McALISTER, C. J., and ROSS, J., concur.