240 P.2d 185

BRISTOR et al. v. CHEATHAM et al.

No. 5334.

Supreme Court of Arizona.

Jan. 12, 1952.

Rehearing Granted Feb. 26, 1952.

230

Dwight L. Solomon, Phoenix, for appellants.

Cunningham, Carson, Messinger & Carson, Snell & Wilmer and Wilson & Wilson, Phoenix, for appellees.

Kramer, Morrison, Roche & Perry, Jennings, Strouss, Salmon & Trask, Moore & Romley, Scott & Green, Walton & Walton and Whitney, Ironside & Whitney, Phoenix, Reed & Wood, Coolidge, Fred O. Wilson, Atty. Gen., Perry M. Ling, Chief Asst. Atty. Gen., amici curiae.

PHELPS, Justice.

This is an appeal from a judgment of the trial court dismissing plaintiffs' cause of action in which plaintiffs sought to restrain defendants from abstracting and di-

verting or using any waters which plaintiffs were pumping from domestic wells on their respective properties and for damages sustained.

The complaint alleges that plaintiffs have been the owners of the properties upon which they reside for many years and have been in possession thereof and expended large sums of money improving their land by building homes thereon, boring wells for domestic purposes, and various other improvements.

They further allege there is a common supply of underground water underlying the premises of plaintiffs and defendants; that since 1916 their domestic supply of water has been, and is, derived exclusively from this underground water supply and that they have enjoyed the use of the same continuously since that time; these lands are located one and a half miles south and one mile east of Laveen; and that defendants' lands are west of plaintiffs' lands.

That in the years 1948 and 1949 defendants sank a number of large wells (eleven in all) to great depths and are taking the water by means of powerful pumps from this common water supply and are conveying it off the premises from which it is pumped to other lands owned by defendants, approximately three miles distant, where they are using it in reclaiming from the desert other lands not adjacent to the land from which water is being pumped.

They further allege that the withdrawal of such water from the common underground water supply has resulted in drying up the domestic wells of plaintiffs making it necessary in some cases for plaintiffs to haul their domestic water supply from other places and that as a result of defendants' action plaintiffs have been greatly damaged. In a second count they allege the waters from which their wells are supplied are taken from an underground stream. They prayed for an injunction against defendants enjoining them from further operation of said wells and for damages which they have thus far sustained.

Defendants moved to dismiss plaintiffs' complaint upon the ground that neither count therein stated a cause of action. The motion to dismiss was granted and judgment entered thereon. It is from this judgment that this appeal is being prosecuted.

 Appellants claim that the court erred in dismissing their complaint and entering judgment thereon for the reason the complaint stated a cause of action in both its first and second counts. The allegations of the second cause of action though not artfully drawn are sufficient to inform defendants that plaintiffs claim the existence of an underground stream of water flowing beneath their soil from which they had taken water for many years and used it for domestic purposes (being the highest beneficial use known to the law). Some of these wells have been in existence since 1916. Plaintiffs therefore had the right to offer proof to establish the facts alleged in their second cause of action, for clearly

such waters are appropriable under section 75–101, A.C.A.1939, and the court erred in deciding this issue without evidence being taken, thereby denying plaintiffs their day in court.

Under our previous decisions we have said that water is presumed to be percolating until it is proved by clear and convincing evidence that it is not; Maricopa County Municipal Water Conservation District No. 1 v. Southwest Cotton Co., 39 Ariz. 65, 4 P.2d 369; Ryan v. Quinlan, 45 Mont. 521, 124 P. 512. Assuming plaintiffs' wells were supplied by percolating waters then if our pronouncement in the case of Howard v. Perrin, 1904, 8 Ariz. 347, 76 P. 460, affirmed 200 U.S. 71, 26 S.Ct. 195, 197, 50 L.Ed. 374,—to the effect that waters percolating generally through the soil beneath the surface of the earth are a component part thereof, having no characteristic of ownership distinct from the land itself, and are the property of the owner of the soil—is to be adhered to, the ruling of the trial court dismissing the first cause of action was correct.

Let us observe here that all of the attorneys who filed briefs in the instant case agreed in their arguments before the court that the decision in Howard v. Perrin, supra, in so far as it relates to percolating waters being a part of the soil is dicta to which we add our concurrence.

It will also be interesting to note that the Supreme Court of the United States in affirming the decision of this court, after stating that Howard's claim was upon "* * * a prior appropriation of all the water flowing in a subterranean stream * * *" and quoting sections 3199 and 3201 of the Arizona Revised Statutes of 1877 declaring all rivers, creeks and streams of running water in the Territory to be public and applicable to the purposes of irrigation and mining and providing for conveying the same through canals, etc., used the following language:

"We need not stop to inquire whether these sections apply to subterranean streams, because the finding of fact, which is sustained by the testimony, is 'that the only water upon said land is percolating water, oozing through the soil beneath the surface in an undefined and unknown channel.' Of course this excludes the idea of a 'river, creek, or stream of running water.'

"We see no error in the record, and the judgment of the Supreme Court of Arizona is affirmed."

The sum total of the decision is that the claim is based upon the appropriation of water from a running stream. The evidence showed it was percolating water oozing through the soil. Therefore the court said it was not necessary to determine whether the statute applied to subterranean streams, indicating that the sole question before that court relating to water was whether the Arizona statute quoted applied to subterranean streams.

Plaintiffs first urged that their rights under the first cause of action should be deter-

mined under the rule of "reasonable use" or the doctrine of "correlative rights" as it is sometimes called, which is closely akin to the riparian rights doctrine. We believe the matter is properly before us and the time has arrived as predicted by the late Justice Lockwood in the Southwest Cotton Co. case, supra, when the court should review as a new question the nature and ownership of percolating waters and the right to the use thereof. Because of the very great interests involved and the far-reaching effect of a decision upon these questions we have given the matter the most careful consideration and have been materially aided by oral arguments and briefs from distinguished counsel, including counsel appearing as amici curiae.

It has been argued by some of the counsel who have filed briefs amici curiae that upon a determination of the question of whether or not the complaint stated a cause of action and if it is found to do so, the cause should then be remanded to the trial court for trial without any pronouncement whatsoever upon the law applicable to the rights of the parties litigant.

It is argued by other counsel in briefs amici curiae that it is not necessary to a decision of this case to consider the character of percolating waters. We fail to perceive the logic of this statement. The first cause of action of plaintiffs' complaint is grounded wholly upon the theory that their wells are supplied by percolating waters. As above stated all underground waters are presumed to be percolating until shown to be otherwise. Therefore we are directly presented in this case with the precise question of whether percolating waters are public in character and subject to appropriation or whether they are a component part of the earth and are the property of the owner of the soil. We will undertake to meet these issues.

It is also claimed by counsel for appellees supported by briefs amici curiae that the case of Howard v. Perrin, supra, is controlling and having been followed by the later decisions of this court, it is now stare decisis and has even ripened into a rule of property. Other counsel argue that the so-called rule of this court relating to percolating waters as enunciated in Howard v. Perrin, supra, is dicta and is not and has never been the law of this state.

It is contended by some members of this court that regardless of whether the pronouncement in Howard v. Perrin, supra, and later cases is dicta, citizens throughout the state relying upon the decision in that and subsequent cases, have spent large sums of money and that they therefore have vested rights which must be recognized.

With respect to this last contention let us ask the question, what property rights does Howard v. Perrin vest in persons who have developed an underground supply of water?

The common-law rule that water is inherent in the soil and belongs to the owner

of the soil as laid down in the Howard **v.** Perrin case is itself an anomaly. Water, unlike rock and mineral, is migratory. Therefore it is not inherent in the soil as are rock and mineral. All the decisions are to the effect that the property right in water consists alone in the right to its use. Since there is no property right in the water itself *and since it is only its use that is characterized as a property right* and use being incorporeal never becomes a part of the soil. It may become appurtenant to it but never a part of it.

This thought is cogently expressed in an excellent article by Dean Marion R. Kirkwood, entitled "Appropriation of Percolating Waters", appearing in Vol. 1, Stanford Law Review, p. 1, November, 1948: "It is to be hoped that the courts will give thoughtful reconsideration to the conception of ownership of the · corpus of percolating water. It is submitted that this conception is quite unrealistic. It rests on the notion that the overlying-land owner has possession of all that is below the surface of his land, and that there is no distinction in this respect between rock and water. But in fact there is a difference: rocks stay in place, water moves. This so-called possession, and consequent ownership, is then something of constantly changing character. Such ownership cannot apply to a given landowner until the water arrives at, or after it passes, his boundaries. Moreover, his neighbor equally 'owns' the water temporarily under his land.

When one makes use of his supposed ownership by pumping water, he usually takes not only that under his own land, but draws out that from under his neighbor's·land as well. The common-law rule results in permission to one to deprive another of his property merely by taking it—a rather extraordinary doctrine. The reasonable use rule restricts this power slightly, but still approves expropriation of another's property. Doesn't the property interest of the landowner really go only to his exclusive right of access to the water through his land rather than to his ownership of the water itself? * * *"

It follows then that the common-law concept that the owner of the overlying land owns the percolating waters under its surface is fallacious. We will hereinafter undertake to show that the vested rights of the users of percolating waters since the decision in the Howard v. Perrin case are more fully protected under the law of prior appropriation than under the so-called common-law rule.

██ Referring to the argument of counsel that the question is now stare decisis and assuming that the rule relating to percolating waters is not dicta, it is universally recognized that notwithstanding the rule of stare decisis and the inclination to follow precedent the courts have the power to depart from rules previously established especially where to adhere to the rule would be more harmful to the public at large than to overrule precedent

and establish a sound principle. State ex rel. La Prade v. Cox, 43 Ariz. 174, 30 P.2d 825; City of Glendale v. White, 67 Ariz. 231, 194 P.2d 435; State v. Allred, 67 Ariz. 320, 195 P.2d 163, 4 A.L.R.2d 735; Ray v. Tucson Medical Center, 72 Ariz. 22, 230 P.2d 220; Calhoun Gold Min. Co. v. Ajax Gold Min. Co., 27 Colo. 1, 59 P. 607, 50 L.R.A. 209; Great Northern Ry. Co. v. Sunburst Oil Refining Co., 287 U.S. 358, 53 S. Ct. 145, 77 L.Ed. 360.

We are confident that if this court's attention had been called to the act of Congress of March 3, 1877, known as the Desert Land Act, chapter 107, 19 St. at L. 377, U.S.C. Title 43, Sec. 321, 43 U.S.C.A. § 321, either in the case of Howard v. Perrin or subsequent cases relating to the same subject matter, the court would have reached a different conclusion. To not do so would have resulted in the court totally ignoring the plain language of the act of Congress, supra. This it did not have the constitutional authority to do. In doing so it entered the field of legislation resulting in effect in setting aside a valid act of Congress.

We fail to see any danger lurking in a decision of this court holding percolating waters to be public. On the other hand we definitely can see the inevitable exhaustion of all underground waters in the State of Arizona if the rule of private ownership of such waters as enunciated in the Howard v. Perrin case is still held to be the law.

If that rule is adhered to the legislature is shackled from enacting an underground water code to meet the present emergency.

Let us observe here that the vested rights of all persons who have appropriated and applied percolating waters to a beneficial use in this state are fully protected under the law of prior appropriation. In fact more so than under the common-law rule as laid down in the Howard v. Perrin case. In the absence of an express legislative policy on the subject, the rights of the users of percolating water must be governed by the acts of Congress and the acknowledged and accepted customs and usages of this state, i. e., prior appropriation and beneficial use. We agree with the Supreme Court of New Mexico in Yeo v. Tweedy, 34 N.M. 611, 286 P. 970, 974, wherein it is stated: " * * * When we once admit a modification of the common-law rule, as the majority of the states have done, there is no place for us to stop short of the rule of prior appropriation. * * "

To permit the present underground water race to continue unabated, without regulation or control, would inevitably lead to exhaustion of the underground supply and consequently to economic disaster.

The common-law concept that the owner of land owned everything to the center of the earth below and to the sky above became a part of the body of that law under conditions wholly different from those which obtain anywhere today. In fact scientific advancement has made it wholly

inapplicable to present conditions. No one would dare contend that one who flies an airplane over the premises of another is guilty of trespassing and no one would challenge the right of the Federal Government to regulate the use of the air lanes for transportation by means of airplanes.

It is only in recent years that motor operated pumps capable of withdrawing thousands of gallons of water per minute from the earth have been available. These pumping operations create a partial vacuum in the earth in the area where located, thus completely changing by the law of gravity, the course of the percolating waters oozing through the soil in undefined and unknown channels, drawing them into the cavity from every direction. The practical result of such pumping operations is to pursue and withdraw the waters from beneath the surrounding lands as effectively and effectually as if pipes were extended from the well in all directions to and under adjoining lands conveying water through them to the point from which it is pumped to the surface.

■ It is our view that the Desert Land Act of March 3, 1877, declared percolating waters to be public and subject to appropriation. The Act in so far as material reads as follows, section 321 thereof: "* * * it shall be lawful for any citizen of the United States, or any person of requisite age 'who may be entitled to become a citizen, and who has filed his declaration to become such' and upon payment of 25 cents

per acre—to file a declaration under oath with the register and the receiver of the land district in which any desert land is situated, that he intends to reclaim a tract of desert land not exceeding one section, by conducting water upon the same, within the period of three years thereafter, *Provided however* that the right to the use of water by the person so conducting the same, on or to any tract of desert land of six hundred and forty acres shall depend upon bona fide prior appropriation: and such right shall not exceed the amount of water actually appropriated, and necessarily used for the purpose of irrigation and reclamation: and all surplus water over and above such actual appropriation and use, together with the water of all, lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the aproriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights. * * *"

In the case of California Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 55 S.Ct. 725, 727, 79 L.Ed. 1356 (decided in 1935), the Supreme Court of the United States in passing upon the Desert Land Act, supra, stated that: "For many years prior to the passage of the Act of July 26, 1866, c. 262, § 9, 14 Stat. 251, 253 (U.S.C. Title 43, section 661), the right to the use of waters for mining and other beneficial purposes in California and the arid region generally was fixed and regu-

lated by local rules and customs. The first appropriator of water for a beneficial use was uniformly recognized as having the better right to the extent of his actual use. The common law with respect to riparian rights was not considered applicable, or, if so, only to a limited degree. Water was carried by means of ditches and flumes great distances for consumption by those engaged in mining and agriculture. (Citing cases.) The rule generally recognized throughout the states and territories of the arid region was that the acquisition of water by prior appropriation for a beneficial use was entitled to protection; and the rule applied whether the water was diverted for manufacturing, irrigation, or mining purposes. The rule was evidenced not alone by legislation and judicial decision, but by local and customary law and usage as well. * * *"

The court then discusses briefly the effect of the Act of 1866 and states: "* * * This provision was 'rather a voluntary *recognition of a pre-existing right of possession,* constituting a valid claim to its continued use, than the establishment of a new one.' * * *"

It then took up a discussion of the Desert Land Act of March 3, 1877, supra, and made the following pronouncement: "* * * That act (the act of March 3, 1877) allows the entry and reclamation of desert lands within the states of California, Oregon, and Nevada (to which Colorado was later added), and the then territories of Wash-

ington, Idaho, Montana, Utah, Wyoming, Arizona, New Mexico, and Dakota, with a proviso to the effect that *the right to the use of waters by the claimant shall depend upon bona fide prior appropriation, not to exceed the amount of waters actually appropriated and necessarily used for the purpose of irrigation and reclamation. * *"* (Emphasis supplied.)

It then called particular attention to the following portion of the act: "'* * * All surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers, *and other sources of water supply upon the public lands* and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights.'" (Emphasis supplied.)

In discussing this portion of the act the court said: "* * * it had become evident to Congress, as it had to the inhabitants, that the future growth and well-being of the entire region depended upon a complete adherence to the rule of appropriation for a beneficial use as the exclusive criterion of the right to the use of water. * * *"

The court then said: "In the light of the foregoing considerations, the Desert Land Act was passed, and in their light it must now be construed. By its terms, not only all surplus water over and above such as might be appropriated and used by the desert land entrymen, but 'the water of all

lakes, rivers, and other sources of water supply upon the public lands and not navigable' were to remain 'free for the appropriation and use of the public for irrigation, mining and manufacturing purposes.' If this language is to be given its natural meaning, and we see no reason why it should not, it effected a severance of all waters upon the public domain, not theretofore appropriated, from the land itself. * * *"

The court cites with approval the supplemental opinion in Hough v. Porter, 51 Or. beginning at page 382, 98 P. 1083, 1091. In that opinion the court held that the legal effect of the language quoted from the Desert Land Act was to dedicate to the public all interest, riparian or otherwise, in the waters of the public domain, and to abrogate the common-law rule in respect of riparian rights as to all lands settled upon or entered after March 3, 1877. Specifically the court said in Hough v. Porter, supra, with respect to the legal effect of the dedication or reservation of all waters upon the public domain for public use that: " * * * The words 'shall remain and be held free for the appropriation and use of the public for irrigation,' etc., are clearly words of reservation and dedication, and obviously so intended. * * *"

The court further said: "It was in the exercise of a similar prerogative on the part of the government that there was by the act of 1877 given to the public, or to any individual thereof, the right to appropriate and apply to a beneficial use the waters flowing through its public domain. (This case involved the appropriation of waters from a river.) No limit as to the time in which this right may be exercised is made, except in effect that he who first diverts the water and with due diligence applies it to the uses there enumerated is given the better right thereto. It can make no difference, therefore, whether it be termed a grant, reservation, dedication, trust, or other privilege. This unquestioned power of the owner over the public domain was exercised, and any one entering upon, and acquiring title to, any part of the public domain after the passage of this act accepted such land entitled thereto with full knowledge of the law under which the patent was issued; the import thereof being that this right incident to the soil was reserved by the government, *to be held in trust for the public, and that he who first applies the water to a beneficial use shall become the owner of the right thereto,* and that the recipient of such title takes it subject to that right, which he, in common with others of the public, is privileged to exercise. * * *" (Emphasis supplied.)

In approving this opinion the United States Supreme Court said that it was well reasoned and in its opinion reached the right conclusion.

Before concluding its opinion in the California Oregon Power Co. case, supra,

the court further said, 55 S.Ct. page 731: "Nothing we have said is meant to suggest that the act, as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest. What we hold is that following the act of 1877, *if not before,* all nonnavigable waters then a part of the public domain became publici juris, subject to the plenary control of the designated states, including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain. For since 'Congress cannot enforce either rule upon any state,' (Citing case.) the full power of choice must remain with the state. The Desert Land Act does not bind or purport to bind the states to any policy. It simply recognizes and gives sanction, in so far as the United States and its future grantees are concerned, to the state and local doctrine of appropriation, and seeks to remove what otherwise might be an impediment to its full and successful operation. (Citing cases.)" (Emphasis supplied.)

The same conclusion was reached in the case of State of Wyoming v. Colorado, 259 U.S. 419, 42 S.Ct. 552, 66 L.Ed. 999 and in Snake Creek Mine & Tunnel Company v. Midway Irrigation Co., 260 U.S. 596, 43 S.Ct. 215, 67 L.Ed. 423. See also Yeo v. Tweedy, supra, and State ex rel. Bliss v. Dority, 55 N.M. 12, 225 P.2d 1007. In the latter case this precise question has been ably discussed and it was held that percolating waters belong to the public and are appropriable under the act of Congress of March 3, 1877, supra.

In line with these authorities we hold that no act of the legislature was required to invest natural percolating waters with the character of public ownership. Neither the legislature nor the court has the power to divest such waters of their public character. In the absence of legislation restricting the appropriation of natural percolating waters or providing what steps must be taken to make an appropriation thereof, the taking and application of such public waters to a beneficial use was all that was required to acquire a prior vested right to the use thereof.

The appropriation of waters for domestic purposes is the highest beneficial use to which they may be applied. See section 75–102, A.C.A.1939, as amended by Laws of 1941, chapter 84, section 1. It was just as essential that the pioneers who reclaimed the arid lands of Arizona and other arid states appropriate an adequate supply of public waters for domestic purposes in the reclamation of the desert as it was to apply such waters by artificial means to the land itself for the purpose of growing crops thereon. The latter could not have been accomplished without the former.

The above being true, it necessarily follows that waters developed and

used for domestic purposes in the desert area must, in the absence of an express legislative enactment, be governed by the rule that he who first puts it to a beneficial use shall have the prior right thereto. The fact that the legislature has thus far failed to provide the steps to be taken by persons who desire to develop and to put percolating waters to beneficial use has not had the effect of depriving such waters of their public character, nor of abrogating the custom and usages in this area concerning the appropriation of public waters. Congress, having declared such waters to be reserved by the government to be held in trust for the public, subject to the rule of appropriation according to the customs and usages prevailing in the arid states of the West, they continue to be subject to appropriation in accordance with those usages and customs until the legislature prescribes different steps to be taken to accomplish that end. The legislature has provided such measures for practically all public waters except natural percolating waters. The problem of how and when percolating waters of this state are to be hereafter appropriated is a legislative and not a judicial function.

■■■ The legislature has plenary power to provide the method to be employed by any one in this state in order to acquire a vested right in the use of percolating waters so long as it stays within constitutional bounds and conforms with the acts of Congress relating thereto. Our holding in the case of Howard v. Perrin, supra, to the effect that percolating waters belong to the owners of the soil and subsequent decisions to the same effect are in a large measure dicta, legislative in character and clearly in violation of the Desert Land Act of March 3, 1877, supra, which declared all waters to be separate from the soil, belonging to the public and subject to appropriation. The Supreme Court of the United States and other courts of last resort having in effect interpreted this act to include percolating waters, and our further study of the laws applicable thereto having led us to the same conclusion our earlier decisions, whether dicta or otherwise, on this subject are hereby overruled.

■■■ Inasmuch as the legislature has not provided the method by which natural percolating waters may be appropriated the mere appropriation and application of such waters to a beneficial use had the effect of vesting in the user thereof a legal right thereto as of the date the same were put to a beneficial use.

The judgment is reversed and the cause remanded to the lower court with directions to reinstate the complaint for trial in accordance with these pronouncements.

UDALL, C. J., and STANFORD, J., concur.

LA PRADE, Justice (concurring in part and dissenting in part).

I am compelled to dissent from the conclusion reached in the majority opinion in disposing of plaintiffs' asserted first cause of action. The majority opinion, insofar as it treats of the first cause of action, in my judgment is entirely obiter dicta (not upon the point or question in issue), which I shall endeavor to demonstrate.

The majority, relying on our previous decisions with which I have no quarrel, has presumed that subsurface waters are percolating waters which assumption is of course rebuttable. Maricopa County Municipal Water Conservation District No. 1 v. Southwest Cotton Co., 1931, 39 Ariz. 65, 4 P.2d 369. Plaintiffs assumed, in their opening brief, in the first two assignments of error, that the waters in question were percolating waters. Counsel for plaintiffs, in referring to their first cause of action said: *"The first cause of action does not pose a question as to who has the better right between adjoining owners,* both of whom are pumping percolating water and using the water to develop their respective lands. *It does,* however, we believe, *present squarely to this court the proposition that the pumper of percolating water cannot transport such percolating water to some other locality where there would be no opportunity for it to return and replenish the common supply available to the owners of both tracts of land."* (Emphasis supplied.)

Counsel for plaintiffs then says: "Since the appeal is based entirely upon the sufficiency of appellants' complaint, reference is made to the complaint itself."

It is thus seen that counsel's interpretation of his own complaint was that he had stated a cause of action predicated upon either the "reasonable use" or "correlative rights" doctrine.

Amici curiae, Messrs. Moore and Romley, who represent none of the parties in this case, appraise the positions of the parties of record as follows: "The Common Law is urged by the appellees, *correlative rights theory,* embellished by some of the principles of the law of appropriation *by appellant; while we, as amici curiae, suggest the law of prior appropriation as the true rule."* (Emphasis supplied.)

The plaintiffs, in their reply brief, complain of the position taken by the defendants (appellees) as follows: "Appellees' brief seeks to narrow the choices presented to this court between the extreme English common law rule and the correlative rights doctrine. * * *" and assert that the appellees say: "Appellees *agree* with appellants' original contention *that percolating water is the property of the soil.* We believe that this is the settled law in the United States." (Emphasis supplied.)

The appellants (plaintiffs) say: "That is *precisely the position of appellants* in this action and that position is reflected in the complaint. They own their land, they have sunk wells and used the water therefrom for domestic purposes for a long period of

time prior to any action taken by appellees. *If appellees own their percolating water appellants likewise own theirs* and the cases cited by counsel so hold. .* * *" (Emphasis supplied.)

Counsel for plaintiffs then proceeds by recognizing and arguing that the rights of both of the parties are vested in the law of percolating water. His argument is that the court should modify its position and relax the strict English rule relating to percolating waters by apportioning their rights to a reasonable use thereof. At this juncture, I think it advisable to more clearly state the issues as made by the pleadings, and *particularly by the assignments of error.*

Plaintiffs' first two assignments of error are addressed to their first cause of action. The first assignment assigns as error the granting of appellees' motion to dismiss the complaint, and reads as follows: "The Court erred in granting appellees' Motions to Dismiss the First Cause of Action of the Complaint, under date of November 14, 1949, *for the reason* that the First Cause of Action states a valid claim for relief against appellees, since the owner of land overlying a supply of percolating water common to adjoining land owners may not pump the water from wells upon his land and convey it to other lands, for the benefit of those lands, from whence *it does not return to re*plenish the common supply, if such supply available to the adjoining land owners from pumps upon their lands drawing water from such common supply, is diminished to their injury." (Emphasis supplied.)

The second assignment assigns as error the entry of the final judgment dismissing the first cause of action, the specification of error being in the identical words of the first assignment of error. One proposition of law, reading as follows, is offered in support of these two assignments. I quote: "The owner of land overlying a supply of percolating water common to adjoining land owners may not pump the water from wells upon his land and convey it to other lands for the benefit of those lands, from whence it does not return to replenish the common supply, if the supply available to the adjoining land owners from pumps upon their lands drawing water from such common supply, is diminished to their injury."

In my judgment, the only issue before the trial court was whether the owner of land overlying a supply of percolating water common to adjoining land owners may pump the water from wells upon his land and convey it to other lands for the benefit of the latter from whence it does not return to replenish the common supply, if the supply available to the adjoining land owners from pumps upon their lands drawing water therefrom is diminished to their injury. These are the issues made by the parties before this court.

Amici curiae, Jennings, Strouss, Salmon and Trask, in their appraisal of the issues

made by the pleadings of the parties and the record on appeal, state: "Plaintiffs and defendants in this action seem to concede that this State is committed to one doctrine or the other (i. e., 'the strict common law doctrine' or 'the correlative rights doctrine'). *We respectfully submit that neither provides a correct solution."* (Emphasis supplied.)

These amici curiae and others, not representing any of the parties in this case, then proceed to interject into the case the doctrine of prior appropriation, and have successfully persuaded a majority of the court to make a decision upon an issue not presented. Amici curiae, Jennings, Strouss, Salmon and Trask, present the following introduction in their brief: "The decision of the Court in this case may well be the most important in its history. The scope of the doctrine upon which the decision is based may be determinative of the rights of thousands of users of water for stock and irrigation purposes *who are not parties to the litigation or even aware of its pendency. The impact on the economy of the State could be as sudden and devastating as the dropping of a gigantic atomic bomb in our midst.* The purpose of this brief is to point out to the Court the magnitude of the many problems involved and the far-reaching consequences of the decision to be rendered. Should a final determination of a question of such moment be made on the bare record now before the Court? Yet the extreme urgency of the situation will not admit of delay." (Emphasis supplied.)

It occurs to me that the majority decision may well be likened to "the dropping of a gigantic atomic bomb in our midst". I submit that if adhered to, its impact on the economy of this state will be so vast and devastating that no one at this time can envision its effect. I do not believe that this case on its record requires, compels or permits this court to be pressed into becoming both a bomb-maker and a bombardier. In 1931, Mr. Justice Lockwood, in speaking for this court in the case of Water Conservation Dist. No. 1 v. Southwest Cotton Co., supra [39 Ariz. 65, 4 P.2d 372], after carefully considering the statutes from 1864 to the date of the opinion and the various reasons upon which they are based, held that percolating subterranean waters were not subject to appropriation and that such was still the law. That opinion was prefaced by the following statement: "The case is one of the most important which has ever come before this court, involving as it does not only property interests of the value of many millions of dollars, but also a declaration of legal principles *which will in all probability determine and govern to a great extent the course of future agricultural development within the arid regions of Arizona.* The real question involved is the law applicable to the relative rights to the ownership and use of the subterranean waters of the state as against those of the surface waters. We have discussed certain phases of this question in previous cases, but have never made a complete statement of the principles ap-

plying thereto, for the reason that heretofore the development of the subterranean waters has been of comparatively minor importance. We think, however, this case is proof that the time has come when *it is necessary for the protection and guidance of future agricultural development in the state that these principles should be enunciated as clearly and definitely as possible, so that our citizens may know how to guide their future procedure.* For this reason we treat the matter as though it were of first impression in all respects, not only considering the new issues which have arisen, but reconsidering and redetermining the old ones upon which we have heretofore expressed an opinion. * * *" (Emphasis supplied.)

In that case, it was pointed out that as early as 1904, in the case of Howard v. Perrin, 8 Ariz. 347, 76 P. 460, Id., 200 U.S. 71, 26 S.Ct. 195, 50 L.Ed. 374, this court had determined that waters generally percolating through the soil are the property of the owner and not subject to appropriation. This holding was reaffirmed in the case of McKenzie v. Moore, 1918, 20 Ariz. 1, 176 P. 568. In the Southwest Cotton Company case, 1931, [39 Ariz. 65, 4 P.2d 376.] as here, the court had urged upon it the proposition that the holding in Howard v. Perrin was dicta and not binding upon the court. With reference to this contention the court then said: " * * * Whether such statement was, strictly speaking, *dicta* or not, it has been accepted as the law of this juris-

diction for so long, *and so many rights have been based on it,* that only the clearest showing that the rule declared was error would justify us in departing from it. Since the legislative branch of the government in the twenty-five years which have elapsed since the decision in the above case has not seen fit to contradict this interpretation of the law, but rather has confirmed it, we may reasonably assume we correctly stated its meaning." (Emphasis supplied.)

I can now observe that 47 years have elapsed since the pronouncement of the holding in Howard v. Perrin to the effect that percolating waters are not subject to appropriation. At the time of the decision of the Southwest Cotton Company case, 27 years had elapsed since the pronouncement in Howard v. Perrin. Now 20 years have elapsed since the decision in the Cotton Company case. The legislature, at no time from 1904 to the present date, has seen fit to contradict these interpretations of the law, but rather has affirmed them by its inaction.

Having delineated the issues attempted to be made in the complaint and as made in this court by the *assignments of error,* I am utterly surprised at the statement of the majority of the court wherein they state: "We believe the matter is properly before us and the time has arrived as predicted by the late Justice Lockwood in the Southwest Cotton Co. case, supra, when the court should review as a new question the *nature and ownership of percolating* waters and

the right to the use thereof." (Emphasis supplied.)

I respectfully insist that Justice Lockwood, in the Southwest Cotton Co. case, did not predict that in the future this court should or would review anew the question of the nature and ownership of percolating water. What he did say, in this respect, is as follows: "Whether percolating waters in Arizona since the adoption of the Howell Code have been governed by the old English common law in its strictest form, or by the American modification known as the rule of correlative rights, as explained and defined in Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236, 99 Am. St.Rep. 35, and the cases which follow it, based on the doctrine of *sic utere tuo ut alienum non laedas* (use your own property in such a manner as not to injure that of another, Black's Law Dict.), we need not now decide. When the matter is properly before us, we will determine the rule which applies." 4 P.2d at page 376.

If I can understand this statement, it means this: That the court at some time in the future might determine *which* rule applied—the old English common law in its strictest form, or the American modification of the rule known as correlative rights. He did not say or predict that the court in the future would review the question of the nature and ownership of percolating waters or their susceptibility to appropriation. The opinion *specifically* and *unequivocally* held and determined that per-

colating waters were not subject to appropriation. The opinion completely reviewed the law from 1864 down to 1931 and reviewed its previous holdings for the announced purpose that its review and redetermination was timely and *"necessary for the protection and guidance of future agricultural development in the state * * * so that our citizens may know how to guide their future procedure."* 4 P.2d at page 372. (Emphasis supplied.) The majority opinion now comes up with the idea that this is the time to hold for naught all that has been previously said and with one detonating bomb destroy and wipe out all rights and investments that have been acquired by the expenditure of millions of dollars and the industry of thousands of citizens. These millions of dollars represent not only investments of private persons but for the most part trust funds loaned by insurance companies, banking corporations and other lending agencies. I am confident that many millions are still owed by such borrowers. The majority decision wipes out not only the equity capital of the owners but also the security investments of the individuals and corporations who loaned the money to bring about the huge agricultural development which has occurred in Arizona through the use of percolating waters. This decision affects not only farmers and lenders but it also affects and will affect the way of life of every man, woman and child in the state. The agricultural empire

built up in this state and the wealth created by it directly and indirectly affects the earning capacity of every person earning wages in this state and those dependent upon them. The majority say:

"We fail to see any danger lurking in a decision of this court holding percolating waters to be public. On the other hand we definitely can see the inevitable exhaustion of all underground waters in the State of Arizona if the rule of private ownership of such waters as enunciated in the Howard v. Perrin case is still held to be the law. If that rule is adhered to the legislature is shackled from enacting an underground water code to meet the present emergency.

"Let us observe here that the vested rights of all persons who have appropriated and applied percolating waters to a beneficial use in this state are fully protected under the law of prior appropriation. In fact more so than under the common-law rule as laid down in the Howard v. Perrin case. * * *"

Assuming that percolating waters are subject to appropriation (with which assumption I disagree), I could agree with the observation that "the vested rights of all persons who have appropriated and applied percolating waters to a beneficial use in this state are fully protected under the law of prior appropriation", provided that at the time they made their several appropriations there was water open to appropriation, water which had not been theretofore appropriated. Just who are the prior appropriators that the majority say are now fully protected? In view of the situation as we all know it to be, it is certain that all the wells that have been drilled in the past five years will be closed down and the lands dependent upon them consigned to the desert from whence they came. It may well be that to close down all the wells drilled in the past five years will not be sufficient to protect the "prior appropriators". The owner of any well who can establish that his groundwater has been diminished to his damage by the sinking of wells in the past 5, 10, 15 or 20 years can successfully maintain an action to enjoin the use and abstraction of water from wells subsequent in time to the date that he sunk his and began using water therefrom. Not only will the later user be destroyed but he will be subject to action for damages for his trespasses, though committed under the decisions of this court and following the signposts erected for his guidance and protection.

I honestly believe that the majority decision can result only in chaos and economic disruption. The free availability of credit will be hampered if not found to be entirely unavailable. Interminable and expensive litigation cannot help but arise to the benefit of no one except the legal profession. Neighbor will be set upon neighbor with a harvest of bad feelings and animosities. This for the reason that no well owner can know or have any assurance that he is

a "prior appropriator" with rights that he can protect. A cursory examination of the records in the office of the State Land Commissioner, which are incomplete, indicates that there are approximately 4,500 irrigation wells in Maricopa and Pinal counties, 60% to 70% of which have been drilled in the past 15 years.

The records of the United States Geological Survey, Groundwater Division 1947, and Supplements, indicate that on an average the groundwater level in Maricopa county to the end of 1950 has been lowered 46 feet since the year 1930, arbitrarily fixing the goundwater level in 1930 at zero. This level had been lowered approximately 12 feet at the end of 1944. Since the end of 1944 to the end of 1950, it has been lowered an additional 34 feet. The same records indicate that the safe pumping yield for Maricopa county only is 579,000 acre feet per year, whereas the actual pumping in Maricopa county in 1950 was 1,852,000 acre feet, and the 1951 estimate exceeds 2,000,000 acre feet, as compared to the 943,000 acre feet pumped in 1940. These same records indicate that since 1945 the water pumped in Maricopa county has exceeded the accretion to the groundwater supply in the ratio of 4 to 1. Again referring to these records for Pinal county and arbitrarily fixing the groundwater level at zero for the year 1940, the groundwater level has rapidly lowered. At the end of 1944, it had lowered 10 feet. At the end of 1946 it was down to 20 feet, at the end of 1948 to 33 feet, and at the end of 1950 to 43 feet. In Pinal county at the end of 1940 there was pumped 372,000 acre feet, whereas in 1950 there was pumped 1,180,000 acre feet. These figures, I believe, definitely indicate that the late users of pumped water for irrigation have very definitely interfered with earlier users. In order to discover which of the late users are trespassers and not prior appropriators is going to be a difficult task to determine. In the old-fashioned butter churn it took a lot of strokes of the dasher to separate the butter from the milk. Under the majority decision, it is going to take more than a lot of strokes of the legal dasher to separate the "prior appropriators" from the present users without appropriative rights.

I am of the opinion that the law announced by this court in its previous cases relative to the right to take and use percolating waters has become a settled rule of property in this state. Where a principle of law has become settled by a series of decisions, it is binding on the courts and should be followed. Especially is this true where judicial decisions may be fairly presumed to have entered into the transactions of a state, and have become established as rules of property. 21 C.J.S., Courts, § 216. Quoting from this same section, it is said: " * * * it is the duty of the court, on the principle of stare decisis, to adhere to such decisions without regard to how it might be inclined to decide

if the question were new, and they should not be disturbed except for the most cogent reasons. The rule that such final decisions will ordinarily be adhered to even when they are *erroneous applies to decisions relating to real property with particular force.*" (Emphasis supplied. Citing cases).

It is suggested by some of the amici curiae that the question of whether percolating waters belong to the owner of the soil was not in issue in the Howard v. Perrin case, and that the expression of opinion thereon was dicta, and a rule of property may not be predicated thereon. In referring to the Howard v. Perrin case, they say that a decision of the court upon a point of law predicated upon a stipulation or agreement of counsel upon the law on such point is valueless as a precedent. Assuming that the pronouncement in Howard v. Perrin was dicta, the law as enunciated in the Southwest Cotton Co. case certainly was not dicta. In the Southwest Cotton Co. case, the court said [4 P.2d page 372]: "* * * The real question involved is the law applicable to the relative rights to the ownership and use of the subterranean waters of the state as against those of the surface waters."

The court therein had called to its attention upon contentions made that the rule in Howard v. Perrin was dicta, and then said: "* * * For this reason we treat the matter as though it were of *first impression* in all respects, not only considering the new issues which have arisen, *but reconsidering* and *redetermining the old ones* upon which we have heretofore expressed an opinion." (Emphasis supplied.)

The nature and ownership of percolating waters was not dicta in the case of McKenzie v. Moore, 1918, supra, nor in the case of Brewster v. Salt River Valley Water Users' Ass'n, 1924, 27 Ariz. 23, 229 P. 929. In Adams v. Salt River Valley Water Users' Ass'n, 1939, 53 Ariz. 374, 89 P.2d 1060, one of the contentions made was that the Water Users Association could not pump subsurface waters from plaintiff's lands to be used for irrigation but was limited to the right to pump only for drainage purposes. This contention was overruled, relying on the previous decisions of this court. Clearly, the rule therein announced was not dicta.

That the decisions of this court constitute a rule of property in this state where property rights have been acquired thereunder in reliance thereon was forcibly set forth by Justice McAlister in Schofield v. Gold, 1924, 26 Ariz. 296, 225 P. 71, 74, 37 A. L. R. 275, in the following words: "The decisions of this court having sanctioned such conveyances, and the people and bar of the state having relied upon these holdings, notwithstanding they were made in cases in which the validity of such deeds was not discussed but rather accepted and recognized as a fact, it should not now be held that the court was wrong in pronouncing them valid when to do so *would undoubt-*

*edly result in disturbing many titles, and thus cause injustice to a number of people,* a condition that should never be permitted unless the law is such as to leave the court no alternative." (Emphasis supplied.)

Requoted again, with approval in Blackman v. Blackman, 1935, 45 Ariz. 374, 43 P. 2d 1011. See also Henderson v. Henderson, 1942, 59 Ariz. 53, 121 P.2d 437.

I respectfully submit that there is an alternative, namely, to leave matters in status quo. The legislature of this state has never attempted to regulate the use of percolating ground waters for irrigation, all present rights having been acquired by the inaction of the legislature and under the authoritative decisions of this court, the highest and ultimate authority in this state. A majority of the members of this court now conclude that there is no alternative but to now declare that percolating waters now are and always have been subject to appropriation. They say: "To permit the present underground water race to continue unabated, without regulation or control, would inevitably lead to exhaustion of the underground supply and consequently to economic disaster."

In this position they assume the role of policy makers with a sure-fire remedy. If the decision is allowed to stand, it can conceivably over a period of years and much litigation constitute a "specific" remedy. All the later users of percolating waters who are finally determined to have no appropriative rights will be frozen out. There will then be enough water left for the "prior appropriators" with the danger always lurking that some of them on the bottom of the list will get "bumped". With this situation there will be no necessity for a groundwater code looking toward a limitation of use to be applied ratably to all. Any groundwater code, to be constitutional, must acknowledge and confirm existing rights, and if any limitation or restriction of use is authorized or contemplated, it must apply equally to all of a class.

As I interpret the majority opinion, its author and those assenting thereto conclude that by virtue of the Desert Entry Land Act of 1877 referred to in the majority opinion, they are compelled to hold that underground percolating waters have always been subject to appropriation, and that, in the absence of any express state legislative enactment, are governed by the federal act. I think that the majority have misconceived the true holding of the Supreme Court of the United States in the case of California-Oregon Power Co., Petitioner, v. Beaver Portland Cement Co., 1935, 295 U.S. 142, 55 S.Ct. 725, 731, 79 L. Ed. 1356, in interpreting the effect of the Desert Land Act of 1877. The court said: "Nothing we have said is meant to suggest that the act, as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest. What we hold is that following

the act of 1877, if not before, all nonnavigable waters then a part of the public domain became publici juris, subject to the plenary control of the designated states, including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain. For since 'Congress cannot enforce either rule upon any state,' State of Kansas v. Colorado, 206 U.S. 46, 94, 27 S.Ct. 655, 656, 51 L.Ed. 956 [973], the full power of choice must remain with the state. The Desert Land Act does not bind or purport to bind the states to any policy. It simply recognizes and gives sanction, in so far as the United States and its future grantees are concerned, to the state and local doctrine of appropriation, and seeks to remove what otherwise might be an impediment to its full and successful operation. See State of Wyoming v. Colorado, 259 U.S. 419, 465, 42 S.Ct. 552, 66 L.Ed. 999 [1013].

In the case of State of Kansas v. Colorado, quoted in the above citation, the court had occasion to treat of the power of the federal government with respect to the reclamation of lands in the arid states. Referring to the power of any state, it said: "It may determine for itself whether the common-law rule in respect to riparian rights or that doctrine which obtains in the arid regions of the West of the appropriation of waters for the purposes of irrigation shall control. Congress cannot enforce either rule upon any state. It is undoubtly true that the early settlers brought to this country the common law of England, and that that common law throws light on the meaning and scope of the Constitution of the United States, and is also in many states expressly recognized as of controlling force in the absence of express statute. * * *" [206 U.S. 46, 27 S.Ct. 666.]

It is to be noted in the quotation above from the California-Oregon case that the Supreme Court said that the Desert Land Act does not bind or purport to bind the states to *any* policy. The opinion specifically acknowledges the right of a state to determine for itself to what extent the rule of prior appropriation should obtain or the common law rule in respect of riparian rights. If a state has a right to adopt the common law rule of riparian rights, why does it not have the right to adopt the common law rule relating to percolating waters? The majority opinion seems to conclude that the states are precluded from adopting any rule except that of prior appropriation although they apparently do acknowledge that the states may adopt a rule other than the rule of prior appropriation but that it must be done by state legislation. The Supreme Court in the California-Oregon Power Co. case, in construing the Federal Acts of 1866, 1870 and the Act of 1877, said this: "The effect of these acts is not limited to rights acquired before 1866. They reach into the *future*

*as well,* and approve and confirm the policy of appropriation for a beneficial use, as recognized by local rules and customs, and the legislation and *judicial decisions* of the arid land states, as the test and measure of private rights in and to the nonnavigable waters on the public domain. * * * " (Emphasis supplied.)

I take it by this statement that these federal acts reach into the future and approve and confirm the policy not only of appropriation but any policy of the state recognized by local rules and customs and legislation and judicial decisions. As pointed out in the Southwest Cotton Co. case, and as reviewed therein, this state at no time has seen fit to legislate any rule with reference to percolating waters but has at all times eschewed the subject of their regulation. But we have at all times especially since the Howard v. Perrin case developed customs and usages under the decisions of this court. These customs, usages and decisions have become the common law of this state. "For after all, the common law is but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just between individuals in respect to private disputes." State of Kansas v. Colorado, supra [206 U.S. 46, 27 S.Ct. 667.]

In the case of United States v. Rio Grande Dam & Irrig. Co., 1899, 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136, the court in part, was dealing with the question of riparian rights. The court said that it was within the power of any state to change the common-law rule and permit the appropriation of flowing waters for any purpose it deemed wise. This statement again confirms my conception of the holding in these cases in so far as they interpret the Desert Land Act of 1877.

To this date the state of Arizona is committed to the English doctrine governing the right to take and use percolating waters, this by virtue of our customs, usages and decisions of this court under which many valuable property rights have accrued and on which many contractual rights are based. There is nothing to preclude the legislature from enacting any law that it desires regulating the use of percolating waters but neither this court nor the legislature has the power to destroy and take away vested rights nor may the legislature enact any law impairing the obligation of contracts for to do so would contravene the constitution of the United States and the constitution of this state. Any law that the legislature may enact for regulating the taking or using of percolating ground waters can only be prospective in effect.

Under the previous rulings of this court, the trial court was left with no alternative but to dismiss plaintiffs' first cause of action, as I have interpreted the issue made therein. On appeal to this court, the plaintiffs were justified in presenting the first two assignments of error and this court might very reasonably have undertaken

to review its previous decisions and especially the holding in the Southwest Cotton Company case. The court in that case indicated that: "Whether percolating waters in Arizona since the adoption of the Howell Code have been governed by the old English common law in its strictest form, or by the American modification known as the rule of correlative rights, as explained and defined in Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236, 99 Am.St.Rep. 35, and the cases which follow it, based on the doctrine of *sic utere tuo ut alienum non laedas,* we need not now decide. When the matter is properly before us, we will determine the rule which applies." [4 P.2d page 376]

It occurs to me that under the complaint, as I have analyzed it, the matter is now properly before us, not exactly as stated in the Southwest Cotton Company case but rather whether our percolating waters should be governed by the old common-law rule in its strictest form or the American modification known as the rule of reasonable use. Plaintiffs are complaining of the fact that defendants are taking percolating waters from defendants' adjoining lands and transporting them to distant places to the injury of plaintiffs. What injury? The injury to their domestic wells fed from the common source of supply available to the parties as adjoining landowners. History, economic development, customs, statutory enactment and judicial decisions recognize

a preferential priority or preference in the use of waters for domestic purposes. This springs from stern necessity. I believe that this court should have limited its decision and consideration solely to the issues made on the first cause of action, as I have interpreted them. I also believe, had the court limited its decision to those issues, it should have modified our rule as first announced in Howard v. Perrin by holding that no owner of land should be allowed to withdraw from the percolating waters thereunder water for irrigation or commercial purposes in such quantities as to reasonably interfere with or destroy the percolating waters used for domestic purposes on adjoining lands. Defendants, as far as the pleadings disclose, were proceeding in good faith and were not actuated by any malicious intent, having proceeded in accordance with the rules heretofore enunciated by this court, and should not be held liable in damages. The first cause of action should be reinstated for the sole purpose of allowing plaintiffs to prove the allegations of their complaint as stated in this cause of action for the purpose of proving, if they can, that the actions complained of on the part of the defendants have destroyed their domestic water supply. If these allegations are sustained, the trial court would be authorized and should grant the injunction prayed for or such other relief as mete and proper in the premises.

The court having failed to determine the issues made in the first cause of action ex-

cept by indirection, I am compelled to dissent.

I concur with the majority opinion in its disposition of the second cause of action.

DE CONCINI, Justice (concurring in part, dissenting in part).

I agree with the majority opinion that the second count of appellants' complaint states a cause of action and should be reinstated and the case sent back for trial.

The majority opinion completely disregards the theory of appellants' case in the first cause of action and adopts the doctrine of prior appropriation instead. It probably has done so with the view that appellants are entitled to *some* relief though not on the theory of their complaint. However I believe that doctrine will cause more confusion, result in more lawsuits, nullify more property rights, and do more violence to the peace and tranquilty of the economy of the state than any other avenue this court could have followed.

In attempting to reach some solution that would give appellants the relief that justice appears to demand, and do less violence to existing rights, I suggest three possible theories:

1. Doctrine of reasonable use.
2. Tort action.
3. Preferential priority for domestic use.

There is another possible theory that will not protect any person's rights but will leave the matter solely in the hands of the legislature so that it may regulate the use of groundwater as it sees fit. I will call that theory:

4. Use by sufferance.

Before discussing each one of these theories separately, I will make a few general observations.

The majority opinion assumes from counsel's briefs that the waters in question are percolating waters, although appellants' complaint does not allege such a fact.

I assume that the majority opinion holds that every use of groundwater made in this state was made under the doctrine of prior appropriation whether that was the intention of the users or not and in spite of the lack of statutory authority to make such an appropriation.

I do not agree that all users of percolating water in the state of Arizona since the Desert Land Act of 1877 have a water right under the doctrine of "prior appropriation" to all the water used, to the exclusion of all subsequent users of water under the "custom, usage and court decisions" of this state for a period of 48 years. Such a theory grants appellants water rights that they themselves neither sought nor expected from this court.

The briefs of counsel apparently proceed on the theory that the waters are "percolating", but the contentions as to the law applicable in Arizona to percolating water are four-fold. Appellees contend that percolating water in Arizona is governed

by the strict English rule found in Acton v. Blundell, 12 Mees & W. 324.

Appellants insist that the applicable principle is that of reasonable use as laid down in substance by the supreme court of Oklahoma and California respectively in Canada v. City of Shawnee, 179 Okl. 53, 64 P.2d 694, and Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236 and the cases which follow them.

One of amici curiae claims that percolating water is and aways has been subject to the law of prior appropriation, while other amici curiae hold that percolating water is public and not private in its nature but leaves open the question as to whether it has been or could be actually and legally appropriated by any of the parties in interest. Other amici curiae present the common law doctrine while still others warn us of the dangers of recognizing that doctrine as a rule of property.

The question of the law applicable to percolating water has been before this court in the following cases: Howard v. Perrin, 8 Ariz. 347, 76 P. 460, affirmed 200 U.S. 71, 26 S.Ct. 195, 50 L.Ed. 374; McKenzie v. Moore, 20 Ariz. 1, 176 P. 568; Brewster v. Salt River Valley Water Users' Ass'n, 27 Ariz. 23, 229 P. 929; Maricopa County Municipal Water Conservation District No. 1 v. Southwest Cotton Co., 39 Ariz. 65, 4 P. 2d 369; Fourzan v. Curtis, 43 Ariz. 140, 29 P.2d 722; Campbell v. Willard, 45 Ariz. 221, 42 P. 2d 403; and Adams v. Salt River

Valley Water Users' Ass'n, 53 Ariz. 374, 89 P.2d 1060. In all these cases this court specifically held that waters percolating generally through the soil beneath the surface of the ground are not subject to appropriation for the reason that the law of appropriation was statutory in its nature and that the legislature had failed to include percolating waters as appropriable. It then concluded that since they were not appropriable at that time, the common law rule must govern, and that this rule held that percolating waters are a component part of the earth and have no characteristics of ownership distinct from the land itself and are the property of the owners of the soil. Furthermore the legislature has acquiesced in said theory by not acting on the matter for nearly 50 years.

There can be no question but that if the rule of stare decisis is to be strictly applied, this is the law of Arizona. However, there is a limitation to that rule as found in Maricopa County Municipal Water Conservation District v. Southwest Cotton Co., supra, and governs the use of said percolating water with the following language: "Whether percolating waters in Arizona since the adoption of the Howell Code have been governed by the old English common law in its strictest form, or by the American modification known as the rule of correlative rights as explained and defined in Katz v. Walkinshaw, * * *, and the cases which follow it, based on the doctrine of sic utere tuo ut alienum non laedas, we

need not now decide. When the matter is properly before us, we will determine the rule which applies."

Again in Fourzan v. Curtis, supra [43 Ariz. 140, 29 P.2d 725] this court again hung out the warning signal as follows: " * * * It is the law of Arizona that percolating waters belong to the owner of the land on which they are found. Howard v. Perrin, supra; Maricopa County Municipal Water Conservation District No. 1 v. Southwest Cotton Co., 39 Ariz. 65, 4 P.2d 369. And he may convey them to other premises than those on which they are originally found, *provided no other rights are injured thereby.* Cohen v. La Canada [Land & Water] Co., 151 Cal. 680, 91 P. 584, 11 L.R.A.,N.S., 752." (Emphasis supplied.)

1. Doctrine of Reasonable Use.

The two cases last above decided indicate that the question has not yet been decided. While it is the main point of difference between the parties in this case, the majority opinion has not treated the question on the ground no doubt that it is surplusage.

The argument of appellees is that such a doctrine is inapplicable because it is an offshoot of the riparian doctrine, which has been abolished by our constitution, article 17, section 1. I see no connection between the two, ever though some authorities have said there is, reasoning as follows: that by turning the water, in theory, to a 90° angle, the surface of the land would be riparian to underground water. Furthermore, land riparian to a stream is not analogous to land with percolating water under the surface which is not an underground stream. I prefer to follow the reasoning of the Utah court in Glover v. Utah Oil Refining Co., 62 Utah 174, 218 P. 955, 957, 31 A.L.R. 900: " * * *. So that, while the concensus of opinion referred to in the Horne Case [Horne v. Utah Oil Refining Co., 59 Utah 279, 202 P. 815] finds some analogy between correlative rights to percolating water and riparian rights under the common law, there is, in the opinion of the writer, little or no analogy whatever, especially as affecting the question under review, in this jurisdiction."

The doctrine of reasonable use as distinguished from correlative rights could be applied and appellants' rights protected. Under correlative rights there is an apportionment of water between overlying land owners. Under reasonable use there is no such apportionment, but rather a prohibition upon a use on other land or at a distance away from the base of the common supply if such alien use interferes with the use or water of other property owners. Canada v. City of Shawnee, supra.

2. Tort Action.

While it is true appellants did not bring their complaint on the theory of a tort action, yet we could consider it, as well as the majority opinion considered the theory of prior appropriation.

Under the common law theory a man owns all the water under his land. When he extracts that water by lowering his neighbor's well he is in effect taking his neighbor's property. This amounts to an act of conversion and the taker should be bound to answer in damages. Under the law of property an adjoining landowner owes his neighbor lateral support. If he owes lateral support to his neighbor's soil, where is the inconsistency of such a duty to his neighbor's water? Furthermore when it is conclusively established that one property owner is taking another's property, then the injured person should be made whole. Equity will not suffer a wrong without a remedy.

3. Preferential Priority for Domestic Use.

The majority opinion cites the above as one of its reasons for its decision. I am in accord with that if it were limited to domestic use. Therefore I agree with the majority opinion that appellants' first count states a good claim because it pertains to their use of water for *domestic purposes only*.

Water used for domestic purposes has a preferential priority. Our 1919 Water Code was taken practically verbatim from Oregon. Stewart v. Verde River Irrigation & Power Dist., 49 Ariz. 531, 68 P.2d 329. The Oregon court held in Hough v. Porter, 51 Or. 382, 98 P. 1083, 1085, that water from streams was subject to the doctrine of prior appropriations, but even so "Every riparian owner, therefore, regardless of the date of the settlement, is entitled to the quantity of water reasonably essential to his domestic use and for the watering of his stock, including sufficient supply for the proper irrigation of such garden produce as may be essential to the proper sustenance of his family." Head Note 21.

While appellants are not riparian owners to a stream, nevertheless they are entitled to preferential priority for domestic use.

Should the Howard v. Perrin Doctrine be Declared a Rule of Property?

It appears to me that we are losing sight of the problem before us, and that the majority opinion is trying to settle all the water problems of the state in one fell swoop by saying that the doctrine of prior appropriation has always been the law of this state governing percolating waters. Such a course is fraught with hazard because it upsets a half century of law to the contrary and will affect all water users whether they are parties to this suit or not. The danger of such a course was pointed out in the briefs of other amici curiae not mentioned above. Furthermore the majority opinion has decided this whole matter without any evidence before it. It would appear to me that the proper way to invoke the doctrine of prior appropriation would be by the legislature. That body has the power and right to do so, as they have by heretofore legislating on the subject.

In 1893 "flood waters" were added to the waters subject to appropriation. In 1919 "springs" were added. In 1921 "springs on the surface" were added (to describe the springs which were included in 1919). Ch. 64 of the Session Laws, 1921.

This court will take judicial notice of the shortage of underground water, the increased amount of desert land brought under cultivation in recent years, and the consequent well drilling and water pumpage necessary thereto, and our present diminishing water supply. Under those circumstances the legislature has the right and power to control our ground water supply in the interest of the common weal.

The question then arises as to present use and existing rights. It is apparent that the majority opinion will be a solar plexus blow to farmers who made their investments on the theory of the Howard v. Perrin doctrine. They may now find themselves facing innumerable lawsuits claiming that their water rights do not exist because the water had heretofore been appropriated. The problem arises at this late date when we are acutely aware of our water shortage. To date the farmers have had no notice that their water has been appropriated by others, contrary to "custom, usage, and court decisions". Such a holding would be contrary to the rule of property.

Rule of Property: "'The decisions of this court having sanctioned such conveyances, and the people and bar of the state having relied upon these holdings, notwithstanding they were made in cases in which the validity of such deeds was not discussed but rather accepted and recognized as a fact, it should not now be held that the court was wrong in pronouncing them valid when to do so would undoubtedly result in disturbing many titles, and thus cause injustice to a number of people, a condition that should never be permitted unless the law is such as to leave the court no alternative.'" Blackman v. Blackman, 45 Ariz. 374, 43 P.2d 1011, 1016.

See also Henderson v. Henderson, 59 Ariz. 53, 121 P.2d 437. "* * * but the rule is not so absolutely fixed as to preclude the overruling of plainly erroneous decisions, where it is apparent that the beneficial results to be obtained by a departure from the rule will greatly exceed any disastrous effects likely to flow therefrom." 21 C.J.S., Courts, § 216, p. 398.

In such case, however, the overruling decisions should be limited to prospective operation and should not operate retrospectively.

"* * * The true rule in such cases is held to be to give a change of judicial construction in respect of a statute the same effect in its operation on contracts and existing contract rights that would be given to a legislative repeal or amendment; that is, make it prospective, but not retroactive." 14 Am.Jur. Courts, Sec. 130, p. 347.

" * * * In any event, a court of final decision may expressly define and declare the effect of a decision overruling a former decision, as to whether or not it shall be retroactive, or operate prospectively only, and may, by a saving clause in the overruling decision, preserve all rights accrued under the previous decision." 21 C.J.S., Courts, § 194, p. 327.

The above rule has been approved by the Supreme Court of Arizona, see O'Malley v. Sims, 51 Ariz. 155, 75 P.2d 50, 53, 115 A.L.R. 634: "We think the Supreme Court of Wisconsin has wisely chosen the middle course which avoids, as far as it is possible to do so, injustice to parties who have relied upon the earlier rulings of courts, which are later reversed by the same court, and we have no hesitation in adopting that rule as the law of Arizona. * * *" and also the case of Duhame v. State Tax Commission, 65 Ariz. 268, 179 P.2d 252, 259, 171 A.L.R. 684, where the court says: "However in fairness to the materialmen who have relied upon our express holding in the Crane case that a sale to a contractor was a sale for resale and was not taxable, we now hold that our decision in the instant case shall be given prospective effect only. Unquestionably we have the right to so limit the application of this ruling. (Citing cases.)"

Oregon followed the same rule in National Surety Corporation v. Smith, 168 Or. 265, 114 P.2d 118, 123 P.2d 203, at page 223.

If property rights are going to be established then certainly it is more in line with common sense and logic that a rule of property be invoked that is in harmony with the laws, customs and usage of the state for nearly 50 years, rather than on some theory that is contrary thereto.

Appellants and some amici curiae point out the danger of recognizing the law in Howard v. Perrin as a rule of property as of the date of this opinion and present well depths, because that would amount to "prior appropriation" in reverse. In the instant case appellees have drilled their wells beyond the depth of appellants, leaving the latter high and dry so to speak. If there is a danger lurking behind a rule of property under either theory that would wreck the economy of the state we should adopt theory No. 4 as first above set out.

4. Use by Sufferance.

(a) that percolating waters are public waters;

(b) that the right to "prior appropriation" is statutory;

(c) that the same are subject to legislative control;

(d) all users of such waters have no common law right or right of prior appropriation thereto, but are merely using said waters at sufferance by the state.

The Desert Land Act of 1877 is not controlling. From Winters v. United States, 8 Cir., 143 F. 740, at page 747, we quote: "It necessarily follows from the conclu-

sions we have reached as to the proper interpretation of the treaty that the appellants did not acquire any exclusive or superior right to all the waters of Milk river by virtue of the appropriation of said waters under Desert Land Act March 3, 1877, c. 107, 19 Stat. 377, as amended by Act March 3, 1891, 26 Stat. 1096, c. 561, 1 Supp.Rev.St. 137 [43 U.S.C.A. § 321]. *The law is well settled that the doctrine of appropriation under said statutes, which is recognized and protected by section 2339 of the Revised Statutes [U.S.Com.St.1901, p. 1437 (43 U.S.C.A. § 661)], applies only to public lands and waters of the United States.* * * *"* (Emphasis supplied.)

Such a declaration would leave the legislature with a free hand. It could pass a groundwater code after public hearings, consider water and engineering data, the relative rights of the various interests in the different water basins and water sheds in the state. After gathering all that necessary information the legislature then could with its eyes wide open pass a groundwater code that would be more beneficial and protective to all concerned. Therefore it seems consonant with reason that a decision should be made that is in harmony with the conservation of our limited supply rather than one that will allow *some well and property owners* the right to pump all the water they want or can pump under their particular property right whether it is the common law right or right of prior appropriation.

It strikes me that the following quotation from the majority opinion is handing the legislature an empty shell: " * * * The problem of how and when percolating waters of this state are to be hereafter appropriated is a legislative and not a judicial function."

In other words it says, now that all the water in the state is appropriated you (the legislature) may prescribe rules for appropriating water. Under such circumstances there is nothing remaining for the legislature to do but to invoke the police power of the state, which it could do better under the common law doctrine than it can under the prior appropriation doctrine, and at the same time not upset existing property rights. The reason for that is that the legislature will be confronted with the doctrine of "prior appropriation" when it attempts to regulate percolating waters. Prior appropriators will contend there is no need for regulation because all that is necessary to stop exhaustion of the supply is to stop subsequent pumpers from using the water. If prior appropriation is thus invoked just a comparatively few water users will benefit from the remaining supply. While if the common law theory is recognized then the police power can be invoked equally upon all users and each of them will get some water. It's true that they may all have to take a percentage cut in their acreage farmed but it will not altogether ruin them. I believe the state would benefit more by a fair distribution

of the water rather than have the use curtailed solely at the expense of the junior appropriators.

The majority opinion stating that percolating water was always subject to appropriation because of the acts of Congress, overlooks the decisions of the United States Supreme Court which recognizes the rights of each state to adopt any theory it wishes. The citation from the California Oregon Power Co., a United States Supreme Court case, cited in the majority opinion, confirms the right of every state to adopt any rule it sees fit: "Nothing we have said is meant to suggest that the act, as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest. What we hold is that following the act of 1877, *if not before,* all nonnavigable waters then a part of the public domain became publici juris, subject to the plenary control of the designated states, including those since created out of the territories named, *with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain. For since 'Congress cannot enforce either rule upon any state,'* (citing case), *the full power of choice must remain with the state. The Desert Land Act does not bind or purport to bind* * * *."* (Emphasis supplied.)

See also Hough v. Porter, supra, which cites United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136.

It is to be further noted that the acts of Congress mentioned in the majority opinion, apply likewise to New Mexico, Arizona, California and Utah. In New Mexico, the doctrine of prior appropriation was recognized and upheld. Yeo v. Tweedy, 34 N.M. 611, 286 P. 970; State ex rel. Bliss v. Dority, 55 N.M. 12, 225 P.2d 1007. It should be noted that the New Mexico water code adopted in 1931, specifically provided for prior appropriation for ground waters. In Arizona the common law doctrine has been in use and recognized by the United States Supreme Court. Howard v. Perrin, supra. In California the doctrine of correlative rights has been established and accepted. Katz v. Walkinshaw, supra. The state of Utah sampled all three theories before concluding with a statute on "prior appropriation" in 1935.

Thus it can be seen that Arizona was free to adopt any theory it wished. The doctrine of prior appropriation for percolating waters was not forced on Arizona by the United States Congress.

For the foregoing reasons I dissent in part.